1
2
3
4
5
6
7
8              NOT FOR CITATION
9      IN THE UNITED STATES DISTRICT COURT
10     FOR THE NORTHERN DISTRICT OF CALIFORNIA
11              SAN JOSE DIVISION
12

**United States District Court**
For the Northern District of California

13  The Regents of the University of          NO. C 03-05669 JW
    California,
14
              Plaintiff,
15
                                             **ORDER DENYING CROSS-MOTIONS**
       v.                                    **FOR SUMMARY JUDGMENT RE**
16                                           **UNENFORCEABILITY DUE TO**
    Micro Therapeutics, Inc. et al.,         **INEQUITABLE CONDUCT; DENYING**
17                                           **MOTION TO STRIKE; GRANTING**
              Defendant(s).                  **REQUEST TO SET CASE**
18  _____/        **MANAGEMENT CONFERENCE**

19  Micro Therapeutics, Inc. et al.,
20            Third Party Plaintiff(s),
21     v.
22  Boston Scientific Corp., et al.,
23
              Third Party Defendant(s).
24  _____/

25              I.  INTRODUCTION
26     In December 2003, Plaintiff The Regents of the University of California ("UC" or

27  "Plaintiff") initiated this patent infringement suit against Defendants Micro Therapeutics, Inc. and

28  Dendron GmbH ("MTI" or "Defendants").  All of the twelve patents involved protect Dr. Guido

United States District Court

For the Northern District of California

1   Guglielmi's invention of the Guglielmi detachable coils, which are used to occlude vascular cavities

2   such as brain aneurysms.  In March of 2004, Defendants filed an amended counterclaim alleging that

3   the Guglielmi patents are unenforceable due to, inter alia, Dr. Guglielmi's alleged intentional failure

4   to disclose three documents to the United States Patent and Trademark Office ("USPTO"): (1) his

5   prior publication regarding a method of electrolytically detaching the tip of a guidewire into an

6   aneurysm in order to occlude or block off an aneurysm ("1983 Bari Paper"); (2) his Italian patent

7   application on a device for occluding aneurysms comprising a steel wire with a physically distinct,

8   electrolytically detachable tip; and (3) his Thesis which purportedly covered the same material.

9   Further, Defendants contend that Dr. Guglielmi committed another instance of fraud on the USPTO

10  when he later submitted the 1983 Bari Paper with an inaccurate translation of the word "rottura."

11      Defendants move for summary judgment that the patents-in-suit are unenforceable due to

12  inequitable conduct during their prosecution, and for a finding that this is an exceptional case under

13  35 U.S.C. §285.

14      Plaintiff has filed an opposition to the motion[1] as well as a cross-motion for summary

15  judgment, contending that Defendants cannot present clear and convincing evidence of inequitable

16  conduct.  More specifically, Plaintiff contends that Dr. Guglielmi was not required to submit the

17  1983 Bari Paper because it was cumulative of another prior art reference cited in the "Description of

18  the Prior Art" section of each of his patent applications for the patents-in-suit.  Plaintiff also

19  contends that Dr. Guglielmi was not required to submit his Italian patent application because it was

20  not relevant prior art insofar as the Italian patent was not published or issued until October 1990,

21  months after the March 1990 priority date for the patents-in-suit.  Plaintiff also contends that the

22  Thesis was not publicly available and therefore cannot be relevant prior art.  Plaintiff also contends

23  that the translation of the word "rottura" is precisely accurate.

24

25      [1]  Third Party Defendants Boston Scientific Corporation and its subsidiary, Target
26  Therapeutics, Inc. ("Target"), have also filed an opposition to Defendants' motion for summary
    judgment.  In 1990, UC granted Target an exclusive license to the patents-in-suit.  Target has
27  manufactured and sold the Guglielmi detachable coils under the Target license since that time.

28

1

## II.  BACKGROUND

2

A.      <u>The Patents-In-Suit</u>

3

The patents-in-suit relate to detachable coils that are used to occlude vascular cavities such

4

as brain aneurysms.  An aneurysm is a blood-filled dilation of a blood vessel.  Treatment aims to

5

prevent the blood vessel from rupturing.  The technology described in the patents-in-suit prevents a

6

blood vessel from rupturing by occluding the blood flow in the aneurysm while preserving the

7

normal blood flow through the parent vessel.  To treat brain aneurysms, for example, a neurosurgeon

8

guides a tiny platinum coil, which is attached to a thin wire, into an aneurysm through a catheter

9

inserted into a superficial vessel.  The coil is then detached electrolytically, i.e., by applying a small

10

positive direct current to the wire.  The process is repeated until the aneurysm is filled with coils,

11

which cause the blood flow to slow and to clot.  The clotting, and therefore the occlusion of the

12

aneurysm lessens the chance of rupture.

13

The patents-in-suit are described below and ordered by filing dates.  US Patent No.

14

5,122,136 ("the '136 patent") entitled "Endovascular electrolytically detachable guidewire tip for

15

the electroformation of thrombus in arteries, veins, aneurysms, vascular malformations and

16

arteriovenous fistulas," was filed on March 13, 1990 and issued on June 16, 1992.  US Patent No.

17

5,354,295 ("the '295 patent") entitled "In an endovascular electrolytically detachable wire and tip

18

for the formation of thrombus in arteries, veins, aneurysms, vascular malformations and

19

arteriovenous fistulas," was filed on February 24, 1992 and issued on October 11, 1994.  The

20

following ten patents are all entitled "Endovascular electrolytically detachable wire and tip for the

21

formation of thrombus in arteries, veins, aneurysms, vascular malformations and arteriovenous

22

fistulas."  US Patent No. 5,540,680 ("the '680 patent") was filed on September 23, 1994 and issued

23

on July 30, 1996.  US Patent No. 6,083,220 ("the '220 patent") was filed on May 9, 1996 and issued

24

on July 4, 2000.  US Patent No. 5,855,578 ("the '578 patent") was filed on February 14, 1997 and

25

issued on January 5, 1999.  US Patent No. 6,066,133 ("the '133 patent") was filed on October 6,

26

1997 and issued on May 23, 2000.  US Patent No. 6,010,498 ("the '498 patent") was filed on

27

28

**United States District Court**
For the Northern District of California

October 6, 1997 and issued on January 4, 2000.  US Patent No. 5,976,126 ("the '126 patent") was filed on October 6, 1997 and issued on November 2, 1999.  US Patent No. 5,947,962 ("the '962 patent") was filed on October 6, 1997 and issued on September 7, 1999.  US Patent No. 5,947,963 ("the '963 patent") was filed on October 6, 1997 and issued on September 7, 1999.  US Patent No. 5,925,037 ("the '037 patent") was filed on October 6, 1997 and issued on July 20, 1999.  US Patent No. 5,895,385 ("the '385 patent") was filed on November 6, 1997 and issued on April 20, 1999.

B.   The 1983 Bari Paper

In the late 1970s and early 1980s, Dr. Guglielmi read the work of a French scientist and physician, Dr. Piton, who had published several papers describing his experiments with endovascular electrothrombosis in animals and humans.  Significantly, Dr. Piton published *Selective Vascular Thrombosis Induced by a Direct Electrical Current: Animal Experiments*, J. Neuroradiology, V.5, pages 139-152 (1978).  Dr. Piton's technique involved threading a wire through, and beyond the tip of, a catheter positioned in an artery, and applying a current to the wire electrode to occlude the vessel.  Dr. Piton applied his technique on the femoral vessels, the aorta, the aortic bifurcation, and the common carotid artery of domestic rabbits.  Among other things, Dr. Piton noted the following:

> . . . partial or complete electrolysis of the tip of the wire occurred, fragments of the wire coming to lie free in the region of the thrombus.  This did not appear to be of practical importance, however, and was even somewhat advantageous, since these fragments were visible on the subsequent radiographs.

*Selective Vascular Thrombosis Induced by a Direct Electrical Current: Animal Experiments*, J. Neuroradiology, V.5, p. 145.  His conclusions were set forth in two short paragraphs:

> Therapeutic embolisation is now a well-recognised technique, but certain more or less serious complications impose limitations on its use.  After an experimental study on the rabbit, selective thrombosis by direct current has been carried out twice in humans.  The experimental work on the rabbit continues to establish the parameters for thrombosis of arteriovenous fistulae, relative to their size and the flow through them.
>
> It is hoped that this new technique, which appears to present little or no risk to the internal carotid territory, will widen the indications for therapeutic embolisation.

4

United States District Court

For the Northern District of California

1   Id. at p. 152.

2       Dr. Guglielmi set out to repeat Dr. Piton's electrothrombosis work.  He applied direct

3   electrical current to artificially created aneurysms within rabbits to ascertain: "1) the extent to which

4   the application of a direct electrical current flowing between an external, negatively charged metal

5   plate and a internal positive electrode immersed in the bloodstream causes the formation of an

6   artificial thrombus; 2) whether copper or stainless steel is the metal best suited to inducing

7   electrothrombosis; 3) the optimal current-time ration for producing artifical thrombi."  (Translation

8   of the Proceedings of the II Congresso Nazionale di Neuroradiologia, September 29-30, 1983 ("the

9   1983 Bari Paper").)  During his experiments, Dr. Guglielmi "noticed that the tip of the electrode had

10  separated from the rest of the wire."  (Target Therapeutic's "History of the GDC,"at MT1005442.)

11  Dr. Guglielmi described this separation in the "Conclusions" section of a paper he presented at the

12  conference using the phrase, "con rottura della punta dell'elettrodo."  The paper was published in

13  Italian in the Proceedings of the II Congresso Nazionale di Neuroradiologia, September 29-30, 1983.

14  C.    The Thesis

15      Dr. Guglielmi's work was also described in a thesis submitted to the University of Rome

16  Medical School by Dr. Guglielmi's cousin ("the Thesis").  Dr. Guglielmi conducted experiments in

17  preparation of the Thesis.  One of his experiments involved the application of current to a stainless

18  steel electrode to induce endovascular electrothrombosis.  During this process, he noticed that the tip

19  of the electrode had separated from the wire.  He knew that electrolytic detachment had occurred,

20  documented it with photos in the Thesis, but did not realize its significance until six years later.

21  (Target Therapeutic's "History of the GDC," at MTI005442.)

22      Dr. Guglielmi used the Thesis in his efforts to find funding that would help him

23  commercialize a product.  He traveled to Canada to share his findings with two doctors in order to

24  solicit their opinions on the concept of endovascular electrothrombosis and to obtain funding to

25  develop the concept.  Id.  The Thesis purportedly related to the same work as the 1983 Congresso

26  Nazionale Paper, but it also contained additional information.  (Guglielmi Dep. at 58:2-22.)

27

28                                              5

Dr. Guglielmi brought a copy of the Thesis with him to the UCLA. (Dawes *Cordis* Dep. at 117:9-19.)  Attorney Dawes testified that he had seen Dr. Guglielmi's copy of the Thesis.  Dawes also testified that Dr. Guglielmi asserted that the Thesis was unpublished.  Dawes asked an Italian law firm to find a copy of the Thesis to confirm that it was not on file.  They did not find it.  In August 1999, prior to leaving UCLA and returning to Rome, Dr. Guglielmi disposed of a number of documents and records.  These documents and records included his copy of the Thesis.  Thus far, neither party has been able to find the Thesis.

D.      Dr. Guglielmi's 1988 Italian Patent Application

In 1987, Dr. Guglielmi read a medical article which prompted him to undertake a series of experiments using a stainless steel wire with a micro-magnet.  (Target Therapeutic's "History of the GDC" at MT1005443.)  "Dr. Guglielmi would then apply a few milliamps of current to the stainless wire and, via electrolytic dissolution, detach the micro-magnet inside the model."  Id.  Dr. Guglielmi prepared for an Italian patent application on his distal tip magnet work.  Along with two of his colleagues, he filed Italian Patent Application 48707A88 ("the Italian Patent"), which was published on October 24, 1990.  (Umberger Decl. Ex. 19.)  The patent, entitled [translated] *Intravascular Device for the Occlusion of Saccular Intracranial Aneurysms Induced by Ferromagnetic Thrombosis*, disclosed a device for endovascularly treating aneurysms comprising a steel wire having a physically distinct, electrolytically detachable distal tip.  (Umberger Decl. Ex. 20.)  In the patent, Dr. Guglielmi described a procedure where the distal tip, which included a micromagnet, was used to occlude the aneurysm after which it was selectively detached by electrolytically breaking the guidewire in the vicinity of the tip.  The wire was broken by dissolving it electrolytically through a direct current provided by a generator.  The Italian patent cites the term "rottura" fifteen times.

E.      Disclosing the aforementioned Prior Art to the USPTO

**1. The 1983 Bari Paper**

In the first four patent applications, the '136, '295, '680 and '220 patents, Dr. Guglielmi did not disclose the 1983 Bari Paper to the USPTO.  However, the 1983 Bari Paper was disclosed in the

United States District Court

For the Northern District of California

subsequent eight patents-in-suit.  These patents were disclosed along with an English translation which defined the term "rottura" as the electrolytic decomposition of the wire.

The English translation of the key phrase in the 1983 Bari Paper is set forth below:

In three cases, thrombus formation was partial, <u>with breakdown(*) of the electrode tip</u> in the fundus of the aneurysm . . . .

(*) *Translator's Note*: The term "breakdown" is used here in its meaning of "decomposition" (see *Webster's Third New International Dictionary*, "breakdown", 6a.) specifically, chemical decomposition resulting from the electrolytic process undergone by the electrode.

(Umberger Decl. Ex. 17.)

Further, Defendants contend that Dr. Guglielmi first attempted to deceive the USPTO by failing to disclose the Bari Paper during the prosecution of the first four patents.  He allegedly did so despite citing the paper in his quest for funding.  In 1990, he sought support from the National Institutes of Health ("NIH") for his work.  His application described his previous work beginning with his earlier experiments.  He also mentioned the 1983 Bari Paper where he noted "that at the end of most procedures, the tip ... detached within the clotted aneurysm by electrolysis."  (Plaint Mot. for I.C., at 17.)  In addition, he continued to cite the paper in his publications to the scientific community.  (See Umberger Decl. Exs. 27-29.)

Dr. Guglielmi disclosed the paper starting with the '578 patent, the fifth patent in the sequence.  Defendants allege that the patentee finally disclosed the paper to the USPTO for two reasons.  First, he did so at the bequest of Boston Scientific upon the corporation's acquisition of Target and its intellectual property portfolio in 1996.  (Def. Mot. for I.C., at 23.)  Defendants presume that Boston Scientific sought to clear the patents-in-suit before merging with Target.  Id. Second, Defendants argue that Dr. Guglielmi was forced to disclose the 1983 Bari Paper when Target published a marketing brochure entitled "History of the Guglielmi Detachable Coil," in 1995 which inadvertently revealed the electrolytical detachment process.  (Def. Mot. for I.C., at 21.)

The brochure described his work in the early 1980s and mentioned the detachment of the tip:

1980-1982: "One day, while conducting experiments to assist his cousin in the preparation of a thesis, Dr. Guglielmi was applying current to a stainless steel

7

1    electrode in an attempt to induce endovascular electrothrombosis inside an
2    experimentally created aneurysm.  During the application of current, Dr. Guglielmi
     noticed that the tip of the electrode had separated from the rest of the wire.  Dr.
3    Guglielmi knew that electrolytic detachment had occurred, and documented it with
     photos in the thesis, but did not realize its potential value for another six years."

4    1987: "Once the experiment was completed, Dr. Guglielmi would then apply a few
     miliamps of current to the stainless wire and, via electrolytic dissolution, detach the
5    micro-magnet inside the model."

6    Id.  Further, Defendants allege that Dr. Guglielmi tried to cover his deception with more deception

7    when he finally disclosed the 1983 Bari Paper to the USPTO.  Defendants contend that he "coyly"

8    characterized the paper as a reference which had "come to the attention of [the] applicant."  (Def.

9    Mot. for I.C., at 24.)  Defendants then allege that Dr. Guglielmi tried to cover his failure to disclose

10   the 1983 Bari Paper earlier by distinguishing it from the patents-in-suit.  He allegedly

11   misrepresented the term "rottura" in the 1983 Bari Paper as a decomposition, rather than a selective

12   detachment of the distal tip from the rest of the wire.  (Def. Mot. for I.C., at 25.)  The particular

13   method used to induce selective detachment of the distal tip is as an important feature in the patents-

14   in-suit.

15        **2. The 1988 Italian Patent**

16        In late 1988, Dr. Guglielmi filed his Italian patent application.  (Target Therapeutic's

17   "History of the GDC" at MT1005444.)  Less than a month later, he arrived at UCLA, where he

18   continued his research.  Id.  His early research focused on ferromagnetic thrombosis.  However,

19   because it failed to produce the desired results, he shifted his focus to electrothrombosis.

20        In mid 1989, Dr. Guglielmi submitted a "Disclosure and Record of Invention Form" ("ROI")

21   to the Patent, Trademark and Copyright Office of UCLA.  (Umberger Decl. Ex. 22.)  In the ROI, he

22   described his invention as a device designed to occlude aneurysms through endovascular methods.

23   In the ROI, he distinguished the extravascular approaches from his proposed endovascular methods.

24   Of these methods, he presented four approaches - Electro Thrombosis, IBCA Embolization, Hog

25   Hair Embolization, and FerroMagnetic Thrombosis.  He disclosed that he first conceived of this

26   invention in 1988.  Later, Dr. Guglielmi stated that the year 1988 was made in reference to the

27

28                                                      8

United States District Court
For the Northern District of California

micromagnet approach.

Defendants believe that1 Dr. Guglielmi's ROI was the basis for the patents-in-suit.  They contend that comparison between the invention Dr. Guglielmi disclosed to Plaintiff and the invention embodied in his 1988 Italian Patent reveals that they are one and the same.  Dr. Guglielmi never cited the 1988 Italian Patent to the USPTO.

**3.**      **The Thesis**

Defendants contend that Dr. Guglielmi disclosed his experiments in a Thesis submitted to the University of Rome.  It is undisputed that Dr. Guglielmi wrote the Thesis and in the Thesis there were photos of electrolytic detachment of the wire tip.  (Target Therapeutic's "History of the GDC" at MT1005442).   Dr. Guglielmi testified that although the Thesis related to the 1983 Bari Paper, it contained additional information.

Defendants contend the Thesis was an important part of Dr. Guglielmi's efforts to obtain funding for his experiments.  However, the Thesis was never revealed to the USPTO.  Furthermore, a copy of the Thesis has not been recovered.  Dr. Guglielmi's patent prosecutor, attorney Dawes, testified that he had hired an Italian law firm to search for the Thesis to no avail.  Dr. Guglielmi, though, did bring his own private copy of the paper with him to UCLA, but disposed of it upon his return to Rome.  At the time of his return to Rome, a number of his patents were still pending before the USPTO.  Defendants contend that Dr. Guglielmi knowingly omitted the Thesis from the USPTO and later disposed of his own private copy to ensure that it would be unrecoverable.

III.  STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

The moving party "always bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323.  If the moving party meets this burden, that party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he bears the burden of proof at trial.  Id. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial. " Fed. R. Civ. P. 56(e).  The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties.  To preclude the entry of summary judgment, the non-moving party must bring forth material facts,  i.e., "facts that might affect the outcome of the suit under the governing law  . . . Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).

A party opposing a motion for summary judgment of inequitable conduct is entitled to the usual summary judgment presumptions: "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  See Monsanto Co. v. Bayer BioScience, N.V., 363 F.3d 1235, 1240 (Fed. Cir. 2004).  These inferences can even include questions of credibility and of the weight to be accorded particular evidence.  Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson, 477 U.S. at 255); Matsushita, 475 U.S. at 588; T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 630 (9th Cir. 1987).  It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence."  T.W. Elec. Serv., 809 F.2d at 631.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable

1   jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.  However, "[w]here

2   the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

3   there is no genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587.

## IV.  DISCUSSION

"To hold a patent unenforceable for inequitable conduct, a court must first find, by clear and

convincing evidence, that the applicant omitted or misrepresented material facts with the intention of

misleading or deceiving the patent examiner." <u>Monsanto Co. v. Bayer Bioscience N.V.</u>, 363 F.3d

1235, 1239 (Fed.Cir. 2004).  "Once the challenger has shown the requisite levels of materiality and

intent, the district court must balance the equities to determine whether the patentee has committed

inequitable conduct that warrants holding the patent unenforceable." <u>Id.</u>

In evaluating materiality for purposes of inequitable conduct, the Federal Circuit has noted

that there are five typical categories of materiality.  <u>See</u> <u>Digital Control v. Charles Machinery</u>, 437

F.3d 1309 (Fed. Cir. 2006).  The first is the objective "but for" standard where the misrepresentation

was so material, the patent should not have issued.  The second is the subjective "but for" standard

where the misrepresentation may have influenced the patent examiner in the course of examination.

The third is the "but it may have" standard, where the misrepresentation may have influenced the

patent examiner in the course of examination.  <u>Id.</u> at 1315.  The fourth defines the test for material

information as where there is a substantial likelihood that a reasonable examiner would consider it

important in deciding whether to allow the application to issue as a patent.  This version stems from

the 1977 version of 37 C.F.R. § 1.56 which clarifies the duty of candor and good faith as a

requirement for applicants to disclose "information they are aware of which is material."  Section

1.56 was later amended in 1992, creating the fifth category.  As defined by this version, information

is material to patentability when it is not cumulative to information already of record or being made

of record, and that either (1) by itself or in combination with other information, establishes a <u>prima</u>

<u>facie</u> case of unpatentability of a claim; or (2) refutes, or is inconsistent with, a position the applicant

takes in opposing an argument of unpatentability relied on by the Office or asserting an argument of

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  patentability.

2      Although the latest version of 37 C.F.R.§ 1.56 states a higher standard of materiality, the

3  Digital Control court noted that the section is simply the USPTO's attempted codification of

4  established case law.  Therefore the USPTO's adoption of "an arguably narrower standard of

5  materiality does not supplant or replace our case law." Id. at 1316.  Instead, it "merely provides an

6  additional test of materiality." Id.

7      Intent to deceive is "a separate and essential component of inequitable conduct." Manville

8  Sales Corp. v. Paramount Systems, Inc., 97 F.2d 544, 552 (Fed. Cir. 1990).  Thus, intent to deceive

9  cannot be inferred solely from the fact that information was not disclosed.  Upjohn Co. v. Mova

10  Pharma. Corp., 225 F.3d 1312 (Fed. Cir. 2000).  Nor can it be inferred solely from the materiality of

11  the withheld information.  See Braun, Inc. v. Dynamics Corp. of America, 975 F.2d 815, 822 (Fed.

12  Cir. 1992) ("Thus, in attempting to prove inequitable conduct, [defendant] could not rely solely on

13  the materiality of [plaintiff's] prior art.").  However, direct evidence of intent to deceive or mislead

14  the USPTO is " 'rarely available but may be inferred from clear and convincing evidence of the

15  surrounding circumstances.' " Baxter Int'l. Inc. v. McGaw Inc., 149 F.3d 1321, 1329 (Fed. Cir.

16  1988) (quoting LaBounty Mfg., Inc. v. USITC, 958 F.2d 1066, 1076 (Fed. Cir. 1992)).

17      "Once threshold findings of materiality and intent are established, the trial court must weigh

18  them to determine whether the equities warrant a conclusion that inequitable conduct occurred."

19  Purdue Pharma v. Endo, 438 F.3d 1123, 1128 (Fed. Cir. 2006) (citing Molins PLC v. Textron, Inc.,

20  48 F.3d 1172, 1178 (Fed. Cir. 1995)).  "This requires a careful balancing: when the

21  misrepresentation or withheld information is highly material, a lesser quantum of proof is needed to

22  establish the requisite intent." Purdue Pharma v. Endo, 438 F.3d 1123, 1128 (Fed. Cir. 2006) (citing

23  N.V. Akzo v. E.I. DuPont de Nemours, 810 F.2d 1148, 1153 (Fed. Cir. 1987)).  In contrast, the less

24  material the information, the greater the proof of intent must be. Id.  The different tests for

25  materiality range from broad to narrow.  Accordingly, where a reasonable examiner would merely

26  have considered particular information to be important but not crucial to his decision, the requisite

27

28                                          12

United States District Court

For the Northern District of California

1  finding of intent must be high.  Conversely, where an objective but for standard of materiality is

2  shown, a lesser showing of facts from which intent can be inferred may be sufficient.  <u>Digital

3  Control</u>, 437 F.3d at 1315-16 (citing <u>Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.</u>, 725 F.2d 1350,

4  1363 (Fed. Cir. 1984)).  However, " a grant of summary judgment on the issue of inequitable

5  conduct is permissible, but uncommon.  Generally ... the concerns attendant to awards of summary

6  judgment on inequitable conduct relate to the inherently factual nature of the issue of intent."

7  <u>Digital Control</u>, 437 F.3d at 1317.

8  <u>A.  The Italian Patent</u>

### 9 1.  Materiality of the Italian Patent

10       Plaintiff argues that the Italian patent could not possibly have been material to the

11  examination of the Guglielmi patents-in-suit because it is not prior art.  It supports this with two

12  arguments.  First, the Italian Patent does not cover the same invention.  Second, the Italian Patent

13  does not fall under 35 U.S.C. § 102.

14       Plaintiff contends that the Italian Patent discloses different technology from the patents-in-

15  suit.  It argues that the Italian Patent discloses the use of a magnet to induce the occlusion of

16  saccular intravascular aneurysms by means of ferromagnetic thrombosis.  Plaintiff contends that the

17  patents-in-suit only disclose the method of detaching a tip to occlude aneurysms.  Furthermore,

18  Plaintiff contends that none of the patents-in-suit rely on magnets or ferromagnetic thrombosis.

19  Plaintiff concludes that the Italian Patent could not possibly have anticipated the patents-in-suit.  In

20  addition, Plaintiff argues that Dr. Guglielmi abandoned his experiments from the Italian Patent

21  because of the lack of success.

22       Plaintiff also argues the Italian Patent could not have been used as invalidating prior art

23  under 35 U.S.C. § 102 for two reasons: first, an inventor's own invention cannot be used as prior art

24  against itself absent a statutory bar; and second, foreign patents are relevant only if the invention is

25  patented before the invention or a year before the effective filing date of the United States

26  application.  According to Plaintiff, the Italian Patent was filed in December 1988, but did not issue

27

28                                                13

1   until October 1990, after the filing of the priority application for the Guglielmi patents-in-suit.

2   Therefore, according to Plaintiff, the Italian Patent cannot be material because it is irrelevant prior

3   art.

4       Applying <u>Digital Control</u>, the Court finds that the materiality prong of inequitable conduct

5   does not require that allegedly invalidating reference, here the Italian Patent, constitute prior art to

6   the patents-in-suit.  <u>Digital Control</u>, 437 F.3d at 1316.  Furthermore, regardless of which standard of

7   materiality applies, there is a conflict in the evidence that precludes summary judgment.  On the one

8   hand, Defendants contend that the Italian Patent would have been highly material to a USPTO

9   examiner because it disclosed an intentional, selective electrolytic detachment mechanism and that

10   the failure to disclose it constituted inequitable conduct.  On the other hand, Plaintiff contends that

11   the Italian Patent instead focuses on the ferromagnetic thrombosis technique, which Dr. Guglielmi

12   later abandoned as problematic.  Plaintiff points to the Italian Patent's sole independent claim as

13   describing a device that uses a magnet.

14

15       1) Intravascular device characterized by the fact that it induces the occlusion of
    saccular intravascular aneurysms by means of ferromagnetic thrombosis.  The device
16   consists of:

17       &bull;  a catheter (1) in which has been inserted a stainless steel wire bearing
    an integral small spherical magnet (2) at its extremity.  The catheter's
    (1) function is to infuse a biocompatible solution inside the aneurysm;
18       &bull;  a small spherical magnet (2) about 1 mm. in diameter;
    &bull;  several particles whose maximum dimensions are in the order of a few
19   microns, made of material having good residual magnetic induction
    and good coercive force, such as ferritic powder, suspended in the
20   aforementioned biocompatible solution;
    &bull;  an infusor (4) to determine the thrust of the liquid containing these
21   suspended particles inside the catheter (1) until it reaches the
    aneurysms;
22   &bull;  an electromagnet (3) through whose field poles the solution flows,
    causing the particles in suspension to magnetize;
23   &bull;  a means to bring about the breaking of the steel wire inside the
    catheter (1), leaving behind in the aneurysm the small spherical
24   magnet (2) around which the magnetized particles have accumulated,
    absorbing even blood corpuscles and occluding the aneurysm itself;
25   &bull;  a device signaling the successful breaking of the steel wire and the
    subsequent removal of the catheter (1).

26

27

28                                         14

United States District Court

For the Northern District of California

(Umberger Decl. Ex. 20.)  Plaintiff distinguishes this claim from the invention disclosed by the patents-in-suit, which do not use a magnet.  For example, Plaintiff recites the broadest '136 claim.

> 1.  A method for forming an occlusion within a vascular cavity having blood disposed therein comprising the steps of: endovascularly disposing a guidewire near an endovascular opening into said vascular cavity;
> disposing a distal tip of said guidewire into said vascular cavity to form said occlusion within said vascular cavity about said distal tip; and detaching said distal tip from said guidewire to leave said distal tip within said vascular cavity, whereby said vascular cavity is occluded by said distal tip, and any thrombus formed by use of said tip.

(Chen Decl. Ex. 1.)

A motion for summary judgment is not the appropriate setting to determine whether the Italian Patent would have been material to a USPTO examiner.  Accordingly, the Court finds genuine triable issues as to the materiality of the Italian Patent.

## 2.  Evidence of Intent to Deceive in Not Disclosing the Italian Patent

Plaintiff contends that even if the Italian Patent was material, there is no clear and convincing evidence of Dr. Guglielmi's intent to deceive th USPTO.  Plaintiff argues that Dr. Guglielmi abandoned his previous experiments described in the Italian patent and instead focused on other methods.  Further, Plaintiff notes that Dr. Guglielmi knowingly revealed the marketing brochure entitled "the History of the GDC" to the USPTO, and that the brochure drew attention to the Italian patent.  In addition, Dr. Guglielmi allegedly believed the Italian Patent was owned by his former employers in Rome, and he was not familiar with the process of procuring patents in the United States.  Dawes, the prosecuting attorney, also allegedly had no known of the Italian patent.  Therefore, arguably neither Dr. Guglielmi nor Dawes possessed the requisite intent for a finding of inequitable conduct.

In response, Defendants contend that Plaintiffs fail to state a credible reason for not disclosing the Italian patent.  Defendants also argue that the high materiality of the Italian patent requires a lesser showing of intent to deceive the USPTO.  They argue that the similarities between the patents-in-suit and the Italian patent suggest that Dr. Guglielmi knowingly omitted the Italian

1   patent from the USPTO.

2       The Court has carefully considered the parties' evidence, giving each side its due deference

3   in its capacity as both a moving party and non-moving party.  The evidence on the issue of intent is

4   not so one-sided as to justify summary judgment in either parties' favor.  Therefore, the Court denies

5   the cross-motions for summary adjudication regarding whether failure to disclose the Italian Patent

6   constituted inequitable conduct.

7   B.  The 1983 Bari Paper

8       Defendants contend that Plaintiff committed inequitable conduct by not disclosing the 1983

9   Bari Paper during the prosecution of the first four patents-in-suit.  The patentee later disclosed the

10  paper during the prosecution for the later eight patents-in-suit.  Defendants contend that Dr.

11  Guglielmi also committed inequitable conduct with these patents by submitting the 1983 Bari Paper

12  with a false translation.

13                    **1.  Materiality of the 1983 Bari Paper**

14      Plaintiff contends that the 1983 Bari Paper describes work duplicating experiments that were

15  fully described in a 1978 article by Dr. J. Piton and his colleagues that already had been cited to the

16  Examiner on the face of the specification of each application filed.  Pursuant to the Code of Federal

17  Regulations, "information is material to patentability when it is not cumulative to information

18  already of record or being made of record."  37 C.F.R. §1.56(b).  Thus, "a patentee has no obligation

19  to disclose an otherwise material reference if the reference is cumulative."  Halliburton C. v.

20  Schlumberger Tech. Corp., 925 F.2d 1435, 1440 (Fed. Cir. 1991).

21      Defendants assert, however, that Plaintiff attempted to hide the Piton reference from the

22  USPTO examiner.  Defendants contend that Plaintiff gave the USPTO an inaccurate description of

23  Piton, and buried the beneath four other publications.  Further, Defendants contend that Plaintiff

24  intentionally omitted the Piton reference from the Information Disclosure Statement ("IDS"), in

25  violation of the Manual of Patent Examining Procedure ("MPEP") procedure at the time:

26

27      UC did not follow the express requirements of 37 C.F.R. § 1.98 in effect in 1990,

28                                    16

United States District Court

For the Northern District of California

1    which mandated that "any disclosure statement filed under § 1.98" include (1) a
     listing of all material references; (2) " a concise explanation of the relevance of each
2    listed item," and (3) the submission of a copy of "each listed publication of the
     relevance of each listed item or other item of information in written form or of at least
3    the portions thereof considered by the person filing the disclosure statement to be
     pertinent."
4    (MTI Suppl. Memo. in Support of Mot. for Sum. Judge., at 11 (citing 37 C.F.R. § 1.98(a) (1991).)

5    Defendants argue that this omission failed to give the USPTO examiner proper notice of the Piton

6    reference via the IDS.

7           Defendants also present the opinion of Dr. Larson who asserts that the Piton article was not

8    cumulative as a matter of fact.

9           Furthermore, the wire used in the experiments described in the *1983 Congresso*
     *Nazionale Paper* had to navigate within the catheter from the femoral artery in the leg
10   of a rabbit to the micro-surgically created aneurysms within the carotid artery in the
     neck.  The vessels of the rabbit are very small in cross-section, tortuous and delicate,
11   and using the stiffer and thicker platinum wire used by Piton 1978 would not have
     been practical for these experiments.  The *1983 Congresso Nazionale Paper*
12   demonstrated that a .2 mm stainless steel wire provided both flexibility for
     catheterization and adequate time for electrothrombosis prior to electrolytic cleavage.
13   This is why the *1983 Congresso Nazionale Paper* is so unique.

14   (Larsen Decl. ¶ 12d.)

15          Plaintiff, in turns, assert its own expert, Dr. Nesbit, who believes both references contain

16   substantial similarities and that the differences cited by Defendants are immaterial.

17

18          It is my opinion that, as to the experiments described in Guerrisi et al (1983) and in
     Piton et al (1978), particularly experiment four of Piton et al (1978), the basic
19   concept, results, and conclusion from both papers are the same.  Both papers describe
     successful thrombosis in a vascular structure of a rabbit using an electrical current
20   from an electrode inserted into the vascular structure.  Many of the details of the
     experimental approach are identical with a few differences.
21
22   (Nesbit Decl. ¶ 15.)

23          Plaintiff also argues that the Piton reference was appropriately disclosed according to MPEP

24   procedure because it was incorporated.

25          The regulation in effect when the application was submitted explicitly allowed
     citation of prior art in the specification.  37 C.F.R. § 1.97(a) (1991) ("The disclosure
26   statement may either be separate from the specification or may be incorporated
     therein." (emphasis added)).  Thus, the disclosure of the Piton Article in the
27

28                                                    17

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  specification was proper and common practice at the time the parent '136 patent was
prosecuted.

(Regents' Reply Memo. in Supp. of Mot. for Summ. Judg., at 4 (citing 37 C.F.R. § 1.97(a) (1991)).)

Given the dispute between the parties' two experts, the Court concludes that there exists a genuine issue of material fact with respect to whether the 1983 Bari Paper is duplicative of the 1978 Piton article.

### 2. Patentee's Intent in Failing to Disclose the 1983 Bari Paper

Defendants assert that Dr. Guglielmi intentionally omitted the 1983 Bari Paper. Defendants point out that Dr. Guglielmi used the paper in other events. First, Dr. Guglielmi used the paper in his conference in Bari, Italy in September 1983. Second, he used the paper in his application with the NIH when he sought funding. Third, he also referred to the Paper in some of his publications to the scientific community. He cited the Paper in a "Special Article" he authored for the Journal of Neurosurgery published in July 1991. (Umberger Decl. I Ex. 29) He also cited the paper in chapters that he authored for two neuroradiology textbooks, both of which were published in 1992. (Umberger Decl. I Exs. 27-28)

However, Plaintiff contends that Dr. Guglielmi's testimony that he did not submit the 1983 Bari Paper because he understood it to be cumulative negates any intent to deceive the PTO. Plaintiff argues that Dr. Guglielmi considered the Piton reference to be superior in that it was more prestigious and had undergone a peer review process. In particular, Plaintiff relies upon the following excerpt of Dr. Guglielmi's deposition testimony:

> Q: Is there a reason why in this discussion of these articles you did not include the article that you wrote in September of 1983 that we discussed that relates to the formation of the aneurysms in the rabbits?. . . .
>
> THE WITNESS: I probably, I probably thought that it was not relevant.
>
> BY MR. ABRAMS: Do you have a recollection as to why you thought it was not relevant?
>
> A.  Probably because these articles are so much better than I, than the work I had done.
> . . . .

18

Q.  Did you believe that those articles you said you felt were more relevant to the patent application than your own work in 1983?

A.  Yeah, they were more, you know they were older and so they discovered– they had described the same thing much earlier.
. . . .

A.  To me my experiment of '83 was a repetition of Piton experiment, so . . .

Q.  You felt your experiment was nothing but a repetition of Piton?

A.  Yeah, it was a confirmation that actually what he described was real.

Q.  So do you have a recollection of making a decision not to disclose the 1983 article in your patent application, Exhibit 4B?

A.  Yeah, I thought it was not important.  It was not relevant – I put it in the, in the grant . . . . to show that I was able to do animal experiments.  That I had a history of a person, a doctor able to make animal experiments, familiar with animal experiments.  But as long as the patent is, is concerned, I thought it was not necessary.

Q.  But did you – when you say you felt it was not necessary, did you have an understanding that work that you had done and published in 1983 could constitute prior art to the patent application that you were filing in 1990?

A.  You know these are all publications, you know.  You're talking of Journal of Neurosurgery.  You're talking of Journal of Neurosurgery.  You're talking of Accepta America (Phonetics).  You're talking of journal, Journal of Neuroradiology.  These are top journals with peer reviews.  The '83 stuff was just an abstract from a local meeting.  I didn't want – I mean I felt it was not, it would have – I don't remember actually.  But I probably felt it was not necessary.  It was so minor thing I mean.

(Chen Decl. Ex. 7; Chen Decl. Ex. 6.)

Plaintiff also downplays the NIH grant proposal which referenced the 1983 Bari Paper.  Plaintiff contends that the NIH grant request directly related to, and built upon, Dr. Guglielmi's own experimentation with electrothrombosis and the NIH request form specifically required a listing of all the grant applicant's publications.  Hence, according to Plaintiff, the circumstances surrounding the NIH application are entirely different from those of a patent application.

Plaintiff also contends that Dr. Guglielmi's lack of familiarity with esoteric patent law concepts and with the English language preclude a finding of intent to deceive the USPTO.  As evidence, Plaintiff points to Gugleilmi's good faith intent demonstrated by his formal disclosure of

19

United States District Court

For the Northern District of California

the 1983 Bari Paper in the majority of the patents-in-suit.

Having considered all the arguments, the Court concludes that the disputes presented preclude a summary judgment finding of intent to defraud by omitting the 1983 Bari Paper in the first four patents-in-suit.

### 2.  Intent to Defraud in Submitting the Translated 1983 Bari Paper

Defendants argue that when Plaintiff finally disclosed the 1983 Bari Paper, it did so with a mistranslation.  The term "rottura" was translated to indicate a means of detaching a tip through decomposing or disintegration.  In contrast, the patents-in-suit detach the tip through a breaking process.  Defendants contend that Plaintiff tried to hide the omission of the 1983 Bari Paper in the first four patents-in-suit by distinguishing the Paper through the mistranslation.  Hence, according to Defendants, Plaintiff compounded its previous inequitable conduct with more inequitable conduct, therefore rendering the last eight patents-in-suit unenforceable.

Defendants argues that the term "rottura" was used fifteen times in the Italian patent and each time it was used to indicate a rupture or a break, not decomposition.  Defendants also point to Dr. Guglielmi's application for the NIH grant where he stated that "it is very important to notice that at the end of most procedures, the tip of the stainless steel wire *detached* within the clotted aneurysm by electrolysis."  (NIH Grant at 24 (emphasis added).)  Defendants consider the following excerpt from Dr. Guglielmi's deposition testimony as indicative of an intent to deceive the USPTO.

> Q.... And is that a correct summary of what is described in the 1983 paper, that is the tip of the wire detached within the clotted aneurysm by electrolysis?
>
> A.  You know, look, when did I write this grant?
>
> Q.  May of 1990.
>
> A.  May of 1990.  So I had already – May of 1990, I had already treated patients with the coils.  So I was – I was so familiar with the wording detaching that I wrote detached.  That's the answer

(Guglielmi *Cordis* Dep. at 261:4-13; <u>see</u> also <u>id.</u> at 263:7-267:21.)

Defendants contend that the opinions of Plaintiff's experts, Dr. Nesbit and Dr. Schnapp are

20

1   irrelevant because they looked at the term in a vacuum and failed to interpret the term "rottura" in its

2   proper context.  Instead, Defendants rely upon the opinions of two witnesses who attended the 1983

3   Bari presentation, and heard Gugleilmi's presentation.

> In its original Italian language version the Bari Paper and the term "rottura" does not convey the idea that the electrode tip is chemically decomposed away to nothing by the applied current.  In context, the "rottura" in the Bari Paper means "break" or "rupture."  In its original Italian language, the Bari Paper discloses the phenomenon that the electrode used (made of stainless steel) was observed to break or rupture when current was applied, so that the detached tip portion was left in the fundus of the aneurysm.  That reading of the Bari Paper is consistent with the underlying physics of the process.  Current causes electrolysis of the stainless steel electrode that is exposed to the blood.  The exposed region of the electrode just outside the catheter suffers the greatest electrolysis when the current is applied because the current density is greatest there.  The electrode is therefore observed to break / rupture at that point, leaving the detached electrode tip portion implanted in the fundus of the aneurysm.

(Leonardi Decl. ¶¶ 7-8; see also Molyneux Decl. ¶¶ 5-6.)

Defendants also asserts the opinion of Dr. Marocchino, an Italian expert.

> 11.  As to the Cossu Translation and the Schnapp Declaration, while it is possible for "rottura" to mean "breakdown" in some contexts, the primary meaning of "rottura" is to "rupture" or to "break."  This is aptly shown in the Italian-English dictionaries that I routinely use, which are attached hereto as Exhibit E and include several technical dictionaries, all of which give "break," "breaking" or "rupture" as the first English translation for "rottura."  I do not believe that any competent translator would likely choose "breakdown" or "decomposition" as the English translation of this phrase unless the translator was influenced to select such a translation by communication with another person or by reason of information that is not contained in the 1983 Congresso Nazionale Paper itself.

> 12.  Furthermore, I strongly feel that if a native Italian speaker intended or wished to convey a "breakdown" or "decomposition," that person would not have used the word "rottura;" rather, he would have used another Italian word that would much more precisely convey this meaning.  For example, if the authors had intended to convey "decomposition," they would have used the word "decomposizione," which would be much more commonly understood as such and would more precisely convey "decomposition," or if the authors had intended to convey "dissolution," they would have used the word "dissoluzione" [ as used in Guglielmi's 1988 Italian patent application (Exhibit F hereto) at page 7, where it is obvious that "rottura" is distinct from dissolution - "rottura" is used to indicate breaking of the wire, and "dissoluzione" is used to indicate dissolution of a part of the wire to achieve breaking].

(Marrochino Decl. ¶¶ 11-12.)

United States District Court

For the Northern District of California

21

Defendants also contend that Dr. Guglielmi and prosecuting attorney, Dawes, tampered with the translation.  Defendants recite Cossu's testimony in which he explains that his translation was not entirely free of Dr. Guglielmi or Dawes.  Instead, Cossu stated that his translation was "based on the required information that [he] had," which included "what Guglielmi intended to write."  (Cossu Dep. at 70:20-71:6.)  Defendants believe that Dawes and Dr. Guglielmi improperly consulted with Cossu in two communications where they "persuaded" him to translate a word that he knew meant "break" to mean "decomposition."  (MTI's Supp. Memo. in supp. of Mot. for Summ. Judge., at 16.)  As support, Defendants cite to the following excerpt from the Dawes deposition.

Q.  How many telephone conversations, if you recall, did you have in total with Mr. Cossu prior to receiving a copy of the translation?

A. [BY DAWES]  Maybe two.

***

Q.  Was Dr. Guglielmi involved in either of these two conversations, if you recall?

A.  Yes.

Q.  In both?

A.  No.

Q.  And is it possible for you to put a date on that second conversation, even approximate?

A.  Well, it would have been before delivery of the written translation.

Q.  All right, And how long did the telephone conference involving you and Dr. Guglielmi and Mr. Cossu last?

A.  I can't recollect.  15 minutes, 20 minutes, something on that order.

***

Q.  Did you at the time of this telephone conversation have an understanding that there was a particular word or phrase that was subject to a translation issue?

BSC COUNSEL: Objection; vague.

A.  Yes.

Q.  And what was the word or phrase that - as you now recall?

BSC and UC COUNSEL: [Instruction not to answer]

(Dawes Dep. at 98:2-99:21.)

On the other hand, Plaintiff contends that the term "rottura" can indeed mean decomposition or disintegration.  Plaintiffs cite the opinion of Dr. Schnapp, an Italian expert.  Dr. Schnapp explains that the term "rottura" is a vague Italian word with multiple English references.

21.  I have reviewed the Certified Translation [the translation submitted to the PTO] and the Italian Article, and it is my opinion that the Certified Translation is an accurate translation of the Italian Article.  In particular, the passage "*In tre aneurismi la trombizzazione e stata parziale, con rottura della punta dell'elettrodo nel fondo dell'aneurisma*" is accurately translated as "In three cases, thrombus formation was partial, with breakdown of the electrode tip in the fundus of the aneurysm."

22.  The translation of *rottura* here as "breakdown," annotated as "decomposition," e.g., "chemical decomposition resulting from the electrolytic process undergone by the electrode," in the Certified Translation is accurate and is in harmony with the definition provided in the *Grande Dizionario*: "... final stage in a complex process by means of which materials decompose as the result of ... chemical ... stresses that act upon a portion of a structure ..." and with definition 2 of *rottura dei materiali* from the *Dizionario Tecnico*: "Loss of structural integrity in an object or test sample caused by an alteration in the material itself of some sort: for example, a change that is chemical (see corrosion and degradation)..."

25.  It is my opinion that the Certified Translation is in no way misleading.  Rather, in my opinion, the translator was attempting to be scrupulous to accurately define the term *rottura* in view of the wide range of meanings of the word as described above.  Indeed, far from intending to mislead, it is my opinion that the translator goes to the trouble of annotating his translation to render the translation as accurate as possible.

(Schnapp Decl. ¶¶ 21, 22, 25.)

Plaintiff also argues that the term "rottura" as defined in the context of the invention, could have meant decomposition.  Plaintiff contends that contemporaneous articles indicate that disintegration of the tips in similar electrothrombosis and electrocoagulation experiments had occurred.  The articles mention that some of the electrodes had "fragment[ed]" and "disintegrated." (Bjerknes Decl., Ex 5.)  Other articles cited to the USPTO similarly stated that some electrodes would "disintegrate," (Bjerknes Decl., Ex.6), and that there was "destruction of the guidewire tip," (Bjerknes Decl., Ex7.)  In addition, Plaintiff cites the opinion of Dr. Thompson.  In describing what had actually occurred during past experiments, Dr. Thompson testified that the wires looked like they had been "dissolved in acid" and consequently "corroded and some of them broke off." (Bjerknes Decl., Ex. 9.)  Thus, according to Plaintiff, there was no intent to deceive the USPTO by

United States District Court

For the Northern District of California

1    defining the term "rottura" to mean decomposition.

2         Plaintiff also characterizes Defendants' contention of tampering with the translation as a bald

3    assertion.  In support, Plaintiff presents the testimony of the translator, Cossu, who stated that he

4    translated the term independently.

5

6         Q. And do you currently believe that the translation of this 1983 article is accurate
          and true today?

7         A: I do believe that
                                              ***
8         Q.  Did you arrive at the translation of "rottura" to mean "breakdown" on your own?

9         A.  Yes, I did.

10        Q: And did you prepare this translation, this section of the translation, prior to
          speaking to Dr. Guglielmi?

11
12        A.  Yes, I did.
                                              ***
13        Q.  So you arrived at the translation of "breakdown" on your own.  How did you do
          that?
14
15        A.  Because of "rottura," it is "breakdown," it is a breakdown of the electro tip, the
          tip broke down.
                                              ***
16        Q.  Did you consider any alternative translation of the word "rottura" rather than
          "breakdown"?
17
          A.  Not that I recall, no.
18                                            ***
          Q.  Did you draft the translator's note that we see on U10443
19
20        A.  Yes.

21        Q.  Did you have any assistance in drafting that translator's note?

22        A.  My own.  It is totally my own work.
                                              ***
23        Q.  And what part of that sentence led you to believe that the electro tip decomposed?

24        A.  Because electrolyzation is basically a decomposition process, it is an electrical - it is a
          chemical decomposition caused by the electrical signals flowing from positive to negative,
          and the transformations into ions of the particular chemicals involved.
25

26   (Bjerknes Decl., Ex. 10.)

27

28                                            24

**United States District Court**

For the Northern District of California

1    Having considered all the arguments, the Court concludes that the numerous disputes

2 presented preclude a summary judgment finding of intent to defraud the USPTO by translating the

3 Italian word "rottura" to mean decomposition in the last eight patents-in-suit.

4 C.   The Thesis

5    Defendants argue that Dr. Guglielmi and Dawes intentionally omitted the Thesis from the

6 USPTO to deceive the examiner.  Defendants contend the Thesis relates to the same concepts

7 disclosed by the patents-in-suit and thus should have been revealed to the USPTO.  The Thesis has

8 not yet been found by either party.

9                          **1.  Materiality of the Thesis**

10    Defendants argue that the Thesis related to the same work as the 1983 Congresso Nazionale

11 Paper and it contained additional information not reported in the 1983 paper.  Defendants

12 approximate the Thesis to be fifty to seventy-five pages long in contrast to the nine page 1983 Bari

13 Paper.  Moreover, the Thesis documented electrolytic detachment of the tip from the wire with

14 photographs.  Dr. Gugleilmi also used the Thesis in his efforts to obtain funding.  Hence, according

15 to Defendants, the Thesis was highly material.

16    On the other hand, Plaintiff contends that the Thesis could not possibly be material to the

17 examination of the Guglielmi patents because it was never publicly disclosed, and hence could not

18 serve as invalidating prior art.  As support, Plaintiff cites In re Cronyn, 890 F.2d 1158, 1159-61

19 (Fed. Cir. 1989), where a student's thesis was rejected as invalidating prior art because it was not

20 publicly accessible to the public.

21    The Court notes that it is well settled law that a student Thesis must be catalogued or indexed

22 in such a way as to make it publicly accessible before it can become relevant prior art.  However, a

23 reference need not technically constitute prior art in order to invalidate a patent for inequitable

24 conduct.  Accordingly, the Court finds that the dispute presented precludes a summary judgment

25 ruling on the materiality of the Thesis.

26                                **2.  Intent**

27

28                                  25

Defendants argue that Plaintiff omitted the Thesis with the intent to deceive the USPTO and further compounded his deceit by destroying the evidence.  Defendants contend that Dr. Guglielmi discarded his private copy of his nephew's Thesis in order to frustrate future litigation involving the patents.  Defendants contend that discarding the copy constitutes spoliation of evidence, and therefore Plaintiff should be sanctioned and the Court should make an inference in Defendants' favor that the Thesis was invalidating prior art.

A party engages in spoliation of documents as a matter of law only if the party had "some notice that the documents were potentially relevant to the litigation before they were destroyed." United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002).  In this case, Defendants point out that Dr. Guglielmi sent a letter to UCLA notifying it of potential infringement of his patents by various companies in June 24, 1999.  Dr. Guglielmi left UCLA for Rome in August 1999.  Prior to leaving he disposed of numerous documents, including his copy of the Thesis.

Plaintiff contends that there is no evidence that Dr. Guglielmi had any notice that the Thesis was potentially relevant to litigation. Indeed, Plaintiff contends there is no evidence that Dr. Guglielmi even knew of the possibility of litigation at the time.  Furthermore, Plaintiff contends that its patent counsel had concluded the Thesis was irrelevant to the Guglielmi patents because he had concluded that it was not publicly available.

Q. Did you ever consider disclosing the thesis to the PTO?

A. It wasn't published, that I could determine.

Q. Did you investigate whether it was published?

A. Yes.

Q. Did you ever contact the library of the university to which the thesis was submitted?

A. I hired an Italian law firm to search for it.

Q. Were they able to find it?

A. No.

(Dawes Dep. at 118:15-119:3.)

26

1    Having considered all the arguments, the Court concludes that the disputes presented

2    preclude a summary judgment finding of intent to defraud the USPTO by omitting the Thesis and its

3    subsequent disposal.

4                              V.  CONCLUSION

5    As Plaintiff aptly points out, "[a]ny effort to derive intent by inference rather than from

6    undisputed facts must be left to a finder of fact at trial, not resolved on summary judgment."  (UC's

7    Motion and Opposition, at 19.)  The Court has found sufficient evidence of a material dispute both

8    as to the materiality of the alleged prior art and as to the patentee's intent in omitting it with respect

9    to the Italian Patent, the 1983 Bari Paper, and the Thesis.  Furthermore, the Court finds a material

10   dispute as to the patentee's intent with respect to the 1983 Bari Paper translation.  These disputes are

11   more appropriately decided during trial.  Accordingly, the cross-motions for summary judgment are

12   denied.

13   UC's motion to strike is denied, without prejudice to renew the motion as a motion in limine.

14   It is the Court's preference to consider issues relating to the attorney-client privilege in a separate

15   motion where Defendants lay out more specifically what inferences they contend the Court should

16   make, if any, or what jury instructions the Court should give, if any, regarding UC's invocation of

17   the attorney-client privilege.[2]

18   Lastly, UC's motion to set a case management conference is granted.  The Court will

19   conduct a case management conference on May 22, 2006 at 10:00 a.m.; the parties shall file a joint

20   case management statement no later than May 2, 2006.  Any request to participate via telephone

21   conference must be made in writing no later than May 2, 2006.

22   Dated: April 7, 2006                          /s/James Ware_____
     03cv5669crossmotions                          JAMES WARE
23                                                 United States District Judge

24

25

26   _____

27   [2]  Similarly, the Court prefers for Defendants to renew their request for sanctions relating to
     the destruction of the Thesis in a separate motion in limine.

28                                    27

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2

Charles G. Curtis ccurtis@hewm.com

3

Chien-Ju Alice Chen achen@Fenwick.Com
Christopher T. Holding cholding@goodwinprocter.com

4

Colin G. Sandercock csandercock@hewm.com
David J. Harth dharth@hewm.com

5

Gabrielle E. Bina gbina@hewm.com
J. Anthony Downs jdowns@goodwinprocter.com

6

John S. Skilton jskilton@hewm.com
Julie Lynn Fieber jfieber@flk.com

7

Lynn H. Pasahow lpasahow@fenwick.com
Michael Francis Kelleher mkelleher@fenwick.com

8

Michael J. Shuster mshuster@fenwick.com
Michael K. Plimack mplimack@hewm.com

9

Michelle M. Umberger mumberger@hewm.com
Patrick E. Premo ppremo@fenwick.com

10

Roland Schwillinski rschwillinski@goodwinprocter.com
Sarah C. Walkenhorst swalkenhorst@hewm.com

11

Wendy Lynn Bjerknes Wbjerknes@fenwick.com

12

13

**Dated: April 7, 2006**                           **Richard W. Wieking, Clerk**

14

                                        **By:_/s/JW Chambers_____**
                                        **Melissa Peralta**

15

                                        **Courtroom Deputy**

16

17

18

19

20

21

22

23

24

25

26

27

28